UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Chris Kulak,

        Plaintiff,

v.

Wabash National Corporation,

        Defendant.

Case No. 19-cv-1789 (JNE/HB)
MEMORANDUM
**(FILED UNDER SEAL)**

---

Sarah J. McEllistrem and Charles R. Shafer, Collins, Buckley, Sauntry & Haugh, P.L.L.P., appeared for Chris Kulak.

Jason Hungerford, Nilan Johnson Lewis PA, appeared for Wabash National Corporation.

---

Chris Kulak brought this action against his former employer, Wabash National Corporation, in state court. He alleged that Wabash violated the Minnesota Human Rights Act ("MHRA"), the Minnesota Workers' Compensation Act, and the Minnesota Payment of Wages Act. Kulak also asserted claims of conversion and civil theft. Wabash removed the action from state court. *See* 28 U.S.C. §§ 1332(a)(1), 1441(a). The action is before the Court on Wabash's Motion for Summary Judgment and Kulak's Motion for Partial Summary Judgment. For the reasons set forth below, the Court grants in part and denies in part Wabash's motion and denies Kulak's motion.

## I.    Background

Wabash repaired trailers for FedEx at a facility in Mahtomedi, Minnesota. Kulak started to work as a mechanic, also referred to as a technician, at the facility in November

1

2015 as a temporary employee.  In May 2016, Wabash hired him.  Kulak remained employed by Wabash until his termination in December 2018.

In December 2016, Kulak and another employee were cleaning a trailer.  While sweeping, they broke open a spider nest.  According to Kulak, baby spiders were "all over the place."  A supervisor, Ray Bredow, instructed Kulak and the other employee to close the trailer, bring it outside, and tag it.  They did so.

A day or two later, Kulak brought in a trailer that was parked next to the "spider trailer."  While he was working on it, he felt a bite on his leg.  Something tumbled out of Kulak's pants.  He killed it and subsequently identified it as a black widow spider.

Kulak reported the bite to the service manager, Todd Schuler, who asked how Kulak was feeling and whether Kulak could finish his shift.[1]  Kulak agreed to stay and completed, at Schuler's direction, an incident report regarding the spider bite.

A few days later, Kulak sought medical attention for the bite.  The bite eventually became infected, and Kulak experienced complications that continued into 2018.

In late 2016 or early 2017, Bredow replaced Schuler as service manager.  Bredow moved Kulak from the third shift to the second shift and, in April 2017, made Kulak lead technician.  As lead technician, Kulak assumed additional responsibilities and received additional pay.

---

[1]    Kulak worked the third shift.  According to Kulak, if he had left, the facility would have had to stop work to comply wither OSHA regulations.  Bredow testified that the scope of permissible work would have been limited.

In 2017, Kulak showed pictures of the spider bite to Bredow, who asked whether

Kulak had filed a claim for workers' compensation.  Kulak said that he had not.  In

December 2017, Bredow completed workers' compensation claim forms for Kulak and

told Kulak to expect to hear from an insurance company.  By letter dated July 13, 2018,

Sentry, Wabash's insurer, informed Kulak that his claim was denied: "In our opinion,

your claim was reported beyond the MN filing requirement and there is no medical

evidence to support the presented injury."

Mechanics at Wabash use their own tools and toolboxes.  In 2018, a Wabash

employee damaged Kulak's toolbox by hitting it with a modified golf cart in the shop.

According to Kulak, Bredow said that Wabash's insurer would pay for the toolbox and

that Cliff Johnson, Wabash's regional operations manager, told the insurer the issue

would be resolved internally.  Wabash's insurer did not issue a check for the damage to

Kulak's toolbox.

According to Kulak, Wabash "forced [him] on medical leave" in July 2018.

Bredow told Kulak that issues with Kulak's leg were noticed by drivers, other employees,

and Bredow himself.  Kulak testified that Bredow said, "I'm putting you on medical

leave until you get that taken care of."  Kulak took medical leave from July to November

2018.  His claim for short-term disability benefits was approved in a letter dated

November 9, 2018, from Cigna:

> We are writing to inform you that your claim for Short
> Term Disability (STD) benefits has been approved through
> December 7, 2018.  Life Insurance Company of North
> America administers your claim on behalf of Wabash
> National Corporation's self-insured plan.  Please note that any

> due payments are released by your employer.  Your date of
> disability is July 7, 2018.  Benefits commence on Monday,
> July 16, 2018 following a benefit waiting period of 7 days.

On November 7, 2018, Kulak's doctor released him to return to work on November 12 if Kulak could elevate his leg four times per day for 15 to 20 minutes, keep his wounds clean and covered, and wear compression wraps.  Kulak returned to Wabash on November 12.  After he returned, he informed Bredow that he had scheduled a surgery for sleep apnea in December, that he would be out for four to six weeks, and that he would seek short-term disability benefits.

Within a week of his return to Wabash, Kulak lost the lead designation.  Kulak testified that he and Bredow discussed the lead designation; that Kulak admitted to feeling "maybe a little bit" overwhelmed, "like [he's] nervous"; and that Bredow asked whether Kulak would feel less nervous were he no longer the lead mechanic.  Kulak asked for time to think about it.  The next day, Bredow demoted him.

Kulak had low productivity in his last few weeks at Wabash.  On December 10, 2018, Bredow and Johnson exchanged e-mails about Kulak.  Johnson told Bredow to give Kulak "3 separate corrective actions": (1) low production, written; (2) failure to turn in daily logs, written; and (3) unauthorized overtime, suspension for 3 days.  On December 12, the day of Kulak's scheduled surgery, Wabash terminated him.  According to Kulak, his insurance benefits were terminated effective December 7.

Kulak had longstanding concerns that Wabash was altering his timecards and not paying him for hours worked.  On December 10, the day that Bredow suspended him,

Kulak argued with Bredow via text and raised the possibility of contacting the Department of Labor.  The same day, Kulak contacted the Department of Labor.

According to his attorney, in April 2019, Kulak gave written notice to Wabash that he "was not paid for the hours he worked and which were reflected on his timecards."  By letter dated June 28, 2019, the Department of Labor disclosed the result of its investigation.  The Department of Labor determined that Wabash failed to pay Kulak $628.54 in wages.  According to Jim Fennell, Wabash's senior corporate human resources director, Wabash "provided all Kronos time entries for a two-year period going back to 2017 for all mechanics at the Mahtomedi facility" to the Department of Labor.  Fennell also stated that "[t]he Kronos documents showed each and every time entry, as well as any adjustments made to employee time," that Wabash "provided all of the backup time cards we could find," and that "[t]here were missing backup time cards for all of the mechanics, including Kulak."

Kulak served his complaint on Wabash on June 19, 2019.  Wabash tendered a check to him through his attorney on July 3, 2019.  Kulak did not accept it.

## II.    Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.    Wabash's Motion for Summary Judgment

### 1.    Minnesota Human Rights Act

"Under the MHRA, it is an unfair employment practice for an employer to discharge or otherwise discriminate against an employee because of the employee's disability."  *Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001); *see* Minn. Stat. § 363A.08, subd. 2.  A plaintiff "may prove discriminatory intent by direct evidence or by using circumstantial evidence in accordance with" *McDonnell Douglas*.[2]  *Hoover*, 632 N.W.2d at 542; *see Wagner v. Gallup, Inc.*, 788 F.3d 877, 883 (8th Cir. 2015) ("Under the MHRA, there are two evidentiary frameworks available for plaintiffs asserting disparate treatment claims–the burden-shifting analysis established in *McDonnell Douglas*; or the direct method, using direct or circumstantial evidence.").

Wabash moved for summary judgment on Kulak's MHRA claim, asserting that he has no direct evidence of disability discrimination, that he cannot establish a prima facie case of disability discrimination, and that he cannot demonstrate Wabash's reasons for

---

[2]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

removing the lead designation or terminating him are pretext for discrimination. Kulak opposed Wabash's motion. He asserted he has direct evidence of disability discrimination. In the alternative, he argued that he demonstrated a prima facie case of disability discrimination and that Wabash's reasons for terminating him are pretext for discrimination.

"Courts have found direct evidence of discriminatory motive where a statement or a policy is discriminatory on its face." *Goins v. W. Grp.*, 635 N.W.2d 717, 722 (Minn. 2001). "Direct evidence shows a 'specific link' between the alleged animus and the termination sufficient to support a substantially strong inference that the employer acted based upon that animus." *Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018). The statements that Kulak submitted as direct evidence of discrimination are not sufficient to support a substantially strong inference that Wabash demoted or terminated Kulak because of his disability such that the *McDonnell Douglas* analysis need not be considered. They include Johnson's characterization of Kulak as a "cancer," Bredow's warning to Kulak that Johnson wanted to terminate Kulak after Kulak returned in November 2018, and Johnson's testimony about Bredow's May 2018 request for assistance in obtaining medical treatment for Kulak: "If [Kulak] had any type of medical issues, we would take him off the schedule, and he would have to go get those looked at and then come back again with a hundred percent release to be able to work."

To establish a prima facie case of disability discrimination, Kulak must show that he was disabled within the meaning of the MHRA, that he was "qualified to perform the essential functions of h[is] job, with or without reasonable accommodation," and that he

7

"suffered an adverse employment action because of h[is] disability." *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019) (alterations in original); *see McLain v. Andersen Corp.*, 567 F.3d 956, 967 (8th Cir. 2009). If Kulak establishes a prima facie case of disability discrimination, Wabash "has to show a legitimate, nondiscriminatory reason for the adverse employment action." *Brunckhorst*, 914 F.3d at 1183. Kulak must then show that Wabash's "proffered reason is a pretext for discrimination." *Id.*

Wabash offered legitimate, nondiscriminatory reasons for Kulak's demotion and termination. According to Wabash, "Kulak admitted to being nervous about his ability to keep up with the changes [after his return from leave], so Bredow removed Kulak's lead designation so that Kulak would not be overwhelmed." As to Kulak's termination, Wabash stated:

> On December 10, Bredow sent an email to Johnson stating that Kulak's production was "killing the team," and asked whether Kulak should be suspended or terminated. (Ex. P.) Johnson conferred with Bredow and Senior Human Resources Manager Jim Fennell about Kulak's continued performance issues, and decided to issue three corrective actions to Kulak—one for low production, one for failure to turn in productivity reports/late EMDECS billing, and one for working unauthorized overtime—resulting in Kulak's termination on December 12.

Because Wabash offered legitimate, nondiscriminatory reasons for Kulak's demotion and termination, the Court need not consider the parties' dispute about the prima facie case and turns to the issue of pretext. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007); *Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir. 2006).

Kulak asserted that Wabash's reason for terminating him is pretext for discrimination. He asserted that Wabash treated "similarly situated employees more favorably"; that Wabash "waited to terminate him, although his performance had been deficient since March 2018, until the day that he started medical leave and underwent surgery"; that his supervisors regarded him as a "a good employee when 'healthy'"; and that his "noncompliance with Wabash's fictitious productivity requirement coincided with his disability." Kulak did not direct the Court to the disciplinary histories of the employees whom he identified as similarly situated. Nor did he substantiate his assertion that Wabash's productivity requirements were "fictitious." Nevertheless, the Court concludes that Kulak has submitted sufficient evidence that raises a genuine issue of material fact as to whether Wabash's proffered reasons were pretext for disability discrimination.

Kulak took medical leave from July to November 2018. Shortly before his return to Wabash, his claim for short-term disability benefits was approved. Shortly after his return, Kulak informed Bredow that he would be out from four to six weeks starting in mid-December 2018 for surgery and that he sought short-term disability benefits for it. Within approximately one week of his return to Wabash, Bredow demoted him. According to Kulak, Bredow knew about Kulak's disability; observed that Kulak was "not up to speed" when Kulak returned to Wabash; and said that his "hands were tied" regarding the decision to demote Kulak. At his deposition, Kulak testified that Bredow explained the decision to demote Kulak: "Off the record [Bredow] said, [Johnson] wants you gone, you're costing too much money is what [Bredow's] speculating, and [Bredow]

goes, you're a cancer is what [Johnson] is saying, you're like a disease, you know, you're just spreading." Kulak elaborated on the "cancer" comment: "That's the whole thing is that you're a cancer. He said that to me. I said, well, how? He says, you're coming and going – you know, because people were complaining, coming and going when I want." After reviewing Kulak's hours and productivity, Bredow asked Johnson on December 10 whether to suspend Kulak, "write [Kulak] up," or terminate Kulak. Johnson directed Bredow to give Kulak three corrective actions: (1) "[l]ow production, written"; (2) "[f]ailed to turn in daily logs, written"; and (3) "[u]n-authorized overtime, suspension for 3 days." On December 12, the day of his scheduled surgery, Kulak was terminated. According to Kulak, his insurance benefits were terminated effective December 7. At his deposition, Johnson could not recall the reason why Kulak, who was placed on a 3-day suspension on December 10, was terminated on December 12. Viewing the record in the light most favorable to Kulak, the Court concludes that a reasonable finder of fact could find that Wabash discharged or otherwise discriminated against Kulak because of his disability. The Court denies Wabash's motion on Kulak's MHRA claim.

### 2.    Minnesota Workers' Compensation Act

The Minnesota Workers' Compensation Act states:

> Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee including any diminution in workers' compensation benefits caused by a violation of this section including costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefit to which the employee is entitled.

Minn. Stat. § 176.82, subd. 1. Kulak claimed that Wabash intentionally obstructed his right to benefits. He also claimed that Wabash retaliated against him for filing a workers' compensation claim by terminating his employment.

### a. Obstruction

"In Minnesota, a worker may sue an entity that, in a manner that is outrageous and extreme, or egregiously cruel or venal, intentionally obstructs the worker's right to [workers' compensation] benefits." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012). "The conduct must be proven by clear and convincing evidence." *Id.*

Wabash moved for summary judgment on Kulak's obstruction claim, asserting that it "did not interfere with or obstruct [his] workers' compensation rights or receipt of benefits in any way, let alone in a way that was vexatious, cruel, or venal." According to Kulak, "there is significant evidence that Wabash took proactive steps to hide the [spider bite], deter treatment, and deny the claim."

After the spider bit him, Kulak reported the bite to his service manager, Schuler, who asked how Kulak was feeling and whether Kulak could finish his shift. Kulak agreed to stay and completed, at Schuler's direction, an incident report regarding the spider bite. At his deposition, Kulak testified that he questioned the need to complete the report: "[Schuler] goes, you've got to fill out the incident report. I said, for what? I'm not claiming anything right now. He said, you know, you've still got to fill it out. So I said okay." Later, Kulak testified that he did not think he needed to complete the form: "I figured an incident report was like a work comp that you're trying to take time off. I didn't want to take time off. I wanted to get back to work." He also testified that he

"wasn't trying to claim any . . . medical illness or whatever at that time." Later, the incident report was not found in Kulak's personnel file.

Within a couple of days of the bite, Kulak sought medical attention for the bite. The bite eventually became infected, and Kulak experienced complications that continued into 2018.

In December 2017, Bredow completed workers' compensation claim forms for Kulak. The claim was denied. In its denial letter dated July 13, 2018, Sentry, Wabash's insurer, stated: "In our opinion, your claim was reported beyond the MN filing requirement and there is no medical evidence to support the presented injury."

According to Kulak's deposition testimony, Sentry's claims representative told Kulak that Sentry had received information that Kulak worked as an exterminator. Kulak told the claims representative that he had never been one. The claims representative did not disclose the information's source. Kulak assumed it came from Wabash.

Viewing the record in the light most favorable to Kulak, the Court concludes that he has not demonstrated a genuine issue of material fact as to whether Wabash intentionally obstructed him seeking workers' compensation benefits. The Court grants Wabash summary judgment on Kulak's obstruction claim under the Minnesota Workers' Compensation Act.

### b.    Retaliatory discharge

Wabash asserted that summary judgment on Kulak's claim of retaliatory discharge is appropriate because he cannot demonstrate a prima facie case of retaliation and because he cannot demonstrate that its legitimate reasons for terminating him were

pretext for retaliation. *See Miller v. CertainTeed Corp.*, 971 F.2d 167, 171 (8th Cir. 1992) ("Minnesota courts apply the *McDonnell Douglas* analysis to retaliatory discharge claims under § 176.82."); *Randall v. N. Milk Prods., Inc.*, 519 N.W.2d 456, 459 (Minn. Ct. App. 1994) (stating that retaliatory discharge under Minn. Stat. § 176.82 "is demonstrated by the three-step burden-shifting formula" of *McDonnell Douglas*). Kulak responded that direct evidence of retaliatory discharge exists. *See Schmitz v. U.S. Steel Corp.*, 831 N.W.2d 656, 671 (Minn. Ct. App. 2013) ("[T]he Minnesota Supreme Court has recognized that a plaintiff need not prove a statutory violation using the *McDonnell Douglas* burden-shifting framework when, as here, the plaintiff attempts to prove the violation using direct evidence."), *aff'd*, 852 N.W.2d 669 (Minn. 2014). In the alternative, he maintained that circumstantial evidence of retaliatory discharge exists.

Kulak asserted that "direct evidence exists to demonstrate discriminatory animus to survive summary for four reasons." First, he relied on his report of the spider bite to Schuler, his completion of the incident report at Schuler's direction, Schuler's request that he complete his shift after the spider bite, the infection and complications that continued into 2018, and a request in May 2018 by Bredow of several individuals at Wabash for assistance in obtaining medical treatment for Kulak.

Next, Kulak asserted that his claim for workers' compensation benefits, which Bredow filed on his behalf in December 2017, "was met with fabricated excuses, disingenuous questioning about where the bite occurred, and bold-faced lies regarding his workers compensation benefits." He noted that Sentry's claims representative told him that Sentry received information that he had worked as an exterminator. Kulak assumed

13

the information came from Wabash, but he did not direct the Court to any evidence that identifies the source.

"Third," Kulak argued, "the original incident report 'disappeared' and has not been produced." He asserted that "Wabash sought to pretend and/or ignore that this incident occurred."

Finally, according to Kulak, "Bredow stated that: (1) Kulak had to be fired after his workers compensation claim arose, (2) Kulak was referred to as a 'cancer', (3) Bredow confirmed that Kulak worked hard to provide any and all information regarding his workers compensation claim but was bounced around a lot, and (4) Bredow was told to create a reason to terminate Kulak." The exhibit on which Kulak relies to support this point is an e-mail that an attorney sent to Bredow. Bredow responded that he received the e-mail, that he "will add corrections as needed," that the e-mail "looks close to our conversation," and that he "will send out a minor correction." The Court declines to consider the attorney's e-mail because it is hearsay, *see* Fed. R. Evid. 801, and Kulak has not demonstrated that it is admissible. At his deposition, Bredow did testify that Johnson instructed him to terminate Kulak's employment, that Johnson referred to Kulak as a cancer, and that Kulak worked hard to provide information about his workers' compensation claim. Bredow denied that that Johnson instructed him to "create" a reason to terminate Kulak's employment. Kulak has not supported his claim of retaliatory discharge under the Minnesota Workers' Compensation Act with direct evidence. *See Naguib*, 903 F.3d at 811 ("Direct evidence shows a 'specific link' between the alleged

14

animus and the termination sufficient to support a substantially strong inference that the employer acted based upon that animus.").

"Under the *McDonnell Douglas* framework, an employee alleging retaliatory discharge must first make out a prima facie case consisting of three elements: (1) statutorily protected conduct by the employee; (2) adverse employment action by the employer[;] and (3) a causal connection between the two." *Schmitz*, 831 N.W.2d at 670. If the employee establishes a prima facie case, "[t]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer meets that burden of production, the burden shifts back to the employee to demonstrate that the employer's stated reason for its action was more likely than not pretextual." *Id.* at 670-71 (citation omitted). As stated above, Wabash offered legitimate, nondiscriminatory reasons for Kulak's demotion and termination. The Court turns to the issue of pretext.

Kulak relied on a "series of events after [he] reported his injury" to demonstrate a causal connection between his claim for workers' compensation benefits and his termination: (1) "the destruction of the original incident report"; (2) "Wabash's denial of Kulak to seek immediate medical help"; (3) "the false assertion that Kulak was an exterminator (intimating that is how Kulak got the bite instead of on company grounds)"; (4) "Bredow's statements that Kulak had to be fired after his workers compensation claim"; (5) "Bredow's statements that Kulak was costing the company too much money"; and (6) "Johnson's statement that Kulak was a 'cancer'."

Kulak was bit by a spider in December 2016. Approximately one year later, Bredow, on Kulak's behalf, submitted a claim for workers' compensation benefits. The

claim was denied in July 2018. Wabash terminated his employment in December 2018.

Wabash's inability to produce Kulak's original incident report and request that he

complete his shift after the spider bite do not demonstrate a causal connection between

his workers' compensation claim and his termination. Kulak did not direct the Court to

any evidence that Wabash told the workers' compensation investigator that Kulak

worked as an exterminator. Approximately one year passed between Kulak's claim for

workers' compensation benefits and his termination. *Cf. Smith v. Allen Health Sys., Inc.*,

302 F.3d 827, 833 (8th Cir. 2002) ("Although it is difficult to find a principle neatly

explaining why each of our cases held temporal connection was or was not sufficient to

satisfy the causation requirement, it appears that the length of time between protected

activity and adverse action is important."). Kulak has not explained how his workers'

compensation claim, which was denied, "was costing the company too much money."

He testified that Bredow "was speculating" when Bredow mentioned Kulak's workers'

compensation claim as a reason Johnson sought Kulak's termination. Kulak did not point

to any evidence that indicates Johnson's reference to Kulak as a "cancer" relates to

Kulak's claim for workers' compensation benefits. Viewing the record in the light most

favorable to Kulak, the Court concludes that no reasonable finder of fact could find that

Wabash discharged Kulak for seeking workers' compensation benefits. The Court grants

Wabash summary judgment on Kulak's claim of retaliatory discharge under the

Minnesota Workers' Compensation Act.

### 3.   Minnesota Payment of Wages Act

In his complaint, Kulak alleged that he "was not paid for the hours he worked and which were reflected on his timecards due to Defendant's manipulation of the timecards." He also alleged that his "timecards reflected that he worked 65-70 hours during some weeks but was only paid for 45-50 hours." He claimed that Wabash's "actions violated Minn. Stat. § 181.03," which is part of the Minnesota Payment of Wages Act.

Wabash moved for summary judgment, asserting that Kulak's "claim is for unpaid overtime under the Minnesota Fair Labor Standards Act" and that he had no evidence to support the claim. Notwithstanding Wabash's assertion, Kulak did not assert a claim under the Minnesota Fair Labor Standards Act. Because Wabash moved for summary judgment on a claim that Kulak did not make, the Court denies Wabash's motion on Kulak's claim for violation of the Minnesota Payment of Wages Act.

### 4.   Conversion and civil theft

In his complaint, Kulak alleged that he "was required by Wabash to provide his own tools and toolbox"; that another employee damaged his tools and toolbox; that he "was entitled to reimbursement through company insurance"; that Wabash's "insurance company had a check to reimburse Kulak for the damages caused by another employee, but that check was withheld per the instructions of Cliff Johnson"; and that Wabash's "unlawful withholding of the money constitutes conversion and civil theft." According to Wabash, "there was never any check for the replacement or repair of Kulak's toolbox." Wabash argued that it "could not convert or steal a check that did not exist." Citing Rule 15(b)(2) of the Federal Rules of Civil Procedure, Kulak responded that he intends to

17

amend his complaint and that his claims of conversion and civil theft should be amended

to conform to the evidence. According to Kulak, he "owned a toolbox, Wabash required

him to use the toolbox to perform his job, and although Wabash's policy appears to cover

the damage, Wabash has refused to reimburse him for the same." Wabash opposed

Kulak's request to amend his complaint to assert a claim for breach of an agreement to

repair his toolbox, noting that the deadline to amend pleadings passed approximately 11

months before his request to amend and that he did not demonstrate "good cause." *See*

*Ellingsworth v. Vermeer Mfg. Co.*, 949 F.3d 1097, 1100 (8th Cir. 2020) ("Because

Ellingsworth sought to amend his complaint after the deadline had passed, he must show

'good cause.'").

      "Federal Rule of Civil Procedure 15 describes the methods a party must use to

amend a pleading." *Cook v. City of Bella Villa*, 582 F.3d 840, 852 (8th Cir. 2009). Rule

15(a) addresses amendments before trial. Rule 15(b) addresses amendments during and

after trial. "While Rule 15(b) provides parties with methods to amend a pleading any

time during or after trial, and is therefore not directly applicable to this situation where

the parties intended to amend the complaint before trial, the Federal Rules do recognize

instances when a pleading may be amended by the implied consent of the parties." *Brand*

*v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.3d 799, 803 (8th Cir. 2019) (quoting

*Cook*, 582 F.3d at 852).

      Here, Kulak did not file a motion to amend, he did not demonstrate "good cause"

to amend after the deadline set by the pretrial scheduling order, and Wabash did not

consent to Kulak's putative amendment. Under these circumstances, no amendment is

warranted.  *See Ellingsworth*, 949 F.3d at 1100; *Brand*, 934 F.3d at 803-04; *O'Neil v.*

*Simplicity, Inc.*, 574 F.3d 501, 505 (8th Cir. 2009).

Kulak did not offer any evidence to demonstrate that Wabash converted or stole a

check issued by its insurer for him.  *See* Minn. Stat. § 604.14, subd. 1; *Staffing Specifix,*

*Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115, 125 (Minn. Ct. App. 2017),

*aff'd*, 913 N.W.2d 687 (Minn. 2018).  The Court grants Wabash's motion on Kulak's

claims of conversion and civil theft.

### B.     Kulak's Motion for Partial Summary Judgment

In his complaint, Kulak alleged that he "was not paid for the hours he worked and

which were reflected on his timecards due to Defendant's manipulation of the timecards."

He claimed that Wabash's actions violated the Minnesota Payment of Wages Act, Minn.

Stat. § 181.03.

Kulak moved for summary judgment on his claim that Wabash violated the

Minnesota Payment of Wages Act.  He based his motion on Minn. Stat. § 181.03,

subd. 2, which addresses "payment of commissions":

> Except as otherwise provided in section 181.13, an
> employer or a person, firm, corporation, or association may
> not alter the method of payment, timing of payment, or
> procedures for payment of commissions earned through the
> last day of employment after the employee has resigned or
> been terminated if the result is to delay or reduce the amount
> of payment.

It is undisputed that Kulak was not paid commissions.  He was paid on an hourly basis.

Because Kulak based his motion on an inapplicable statute, the Court denies his motion.

The Court declines to consider the new arguments that he raised in his reply memorandum.  *See* D. Minn. LR 7.1(c)(3)(B).

III.    **Conclusion**

For the reasons set forth above, the Court grants in part and denies in part Wabash's Motion for Summary Judgment and denies Kulak's Motion for Partial Summary Judgment.  The Court will issue a separate order that is consistent with this Memorandum.

Dated: March 31, 2021

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge